Hillsborough, }
Oct. 4, 1932. }

FRANCIS SAURIOLLE, *Adm'r, d.b.n.*

*v.*

WILLIAM S. O'GORMAN, *& a.*

SAME *v.* GEORGE C. SHEA *& Tr.*

*Henry B. Stearns* and *Osgood & Osgood* (*Mr. Clinton S. Osgood* orally), for the plaintiff.

*O'Connor & Saidel* (*Mr. Saidel* orally), for the defendants.

SNOW, J.  I. A verdict was properly directed for the defendant O'Gorman.  He was liable only if Shea, at the time of the accident, was engaged in doing what he was employed to do.  *Danforth* v. *Fisher*, 75 N. H. 111.  The limits of his authorization, his purpose and conduct are undisputed.  His employment on his return trip was to take the car from Concord to the master's garage on Manchester street.  When by direct route he had come to a point on that street within less than two blocks of his destination, instead of turning to the garage he embarked on a detour by Union street, Lake avenue, and Chestnut street, a total distance of ten blocks, for the sole purpose of discharging his passenger guest at a point nearer her home.  While making this detour he was not engaged in what he was employed to do.  The delivery of his guest was no part of his master's service.  Shea was using the instrumentality of his employer for a purpose of his own choosing outside the scope of his employment.  *Danforth* v. *Fisher, supra; Roulias* v. *Crafts*, 81 N. H. 107; *Moulton* v. *Langley*, 81 N. H. 138, 142; *Groatz* v. *Day*, 81 N. H. 417, 418; *Shefts* v. *Free*, 105 N. J. L. 577; *Wilson* v. *Mason*, 105 N. J. L. 540; *Mathis* v. *Company*, 153 Atl., Rep. 700.  See *Dearborn* v. *Fuller*, 79 N. H. 217; *Richard* v. *Company*, 79 N. H. 380; *Defoe* v. *Stratton*, 80 N. H. 109.  See Exp'l. note, *pp.* 15-18, Am. Law Inst. Restatement, Agency.  (Tent.) 459.

The plaintiff contends that the master's consent to the deviation could be implied from the proof of the master's permission on a single occasion to take a young lady for company on a night ride to Lowell. He concedes that this evidence is insufficient to establish a custom, but claims that the master must have understood that the servant in view of that incident would believe he was authorized to take young lady friends on his business trips and perforce to make reasonable deviations to secure their presence.  It is not perceived how such

understanding and belief would help the plaintiff in this phase of his case. The claim here is based upon the doctrine of *respondeat superior*. The vicarious liability of the master for negligent acts of the servant under this doctrine is limited by the bounds of the employment (*Danforth* v. *Fisher, supra; Morin* v. *Company*, 85 N. H. 233; *Fletcher* v. *Meredith*, 148 Md. 580, 582; *Standard Oil Co.* v. *Anderson*, 212 U. S. 215, 220-221) which are not to be extended on remote implications. *LaFond* v. *Richardson*, 84 N. H. 288. Shea had temporarily stepped outside these bounds. The departure was substantial and admittedly for an object that did not concern the master. It had no connection with his business. In making it Shea was not actuated by any purpose to serve the master. If it were conceded that the Lowell incident antedated the accident, and carried an implied consent to take lady friends with him whenever he chose, and by extension to make use of the master's car on detours to receive and discharge them, it would not follow that the master would be responsible for his negligent conduct while on such side trips. While using the car on such diversions his status would be that of a bailee, and not that of a servant. The mere fact that the car was loaned to him by one who stood in the relation of master did not enlarge the scope of his employment so as to charge his benefactor with the consequences of his negligence while making use of the borrowed car solely for his own purposes. His negligence while serving himself or a third party would not be imputable to his master. *Cain* v. *Wickens*, 81 N. H. 99, 100; *Groatz* v. *Day, supra; Reilly* v. *Connable*, 214 N. Y. 586, 590; Am. Law Inst. Restatement, Agency, (Tent.) *s.* 463, *a. b.* See 30 A. L. R. 1248. It is well settled by the authorities that the owner is not liable for the negligent operation of his automobile while being used by his employee in the latter's business although the owner has consented to such use. 22 A. L. R. 1400; 45 A. L. R. 480.

The argument is advanced however, that, regardless of whether Shea had implied authority to take his friend in the car, it could be found that he was acting in the course of his employment. The claim is that, because he had it in mind to carry out the direction of his master to return the car to the garage, and intended to follow a continuous route stopping only long enough to let his passenger alight, his private errand was therefore merely "incidental to the purpose of the general duty"; that his intent to leave his guest short of her ultimate destination tended to show that he was bent primarily on his master's business; and that so long as he was pursuing his dominant purpose to return the car to the garage he was within the scope of his

employment. The difficulty with this argument is that the evidence conclusively shows a temporary abandonment or suspension of his purpose to go to the garage until he should have accomplished a purpose distinctively his own, and entirely disconnected with his master's service. During this departure from his line of duty his dominant purpose was the delivery of his guest at the point intended. It may be conceded that the relative dominance of a servant's purposes may be of importance where, at the time of an accident, he was performing service of a dual character which could be found to inure at the same time to the advantage of both the master and servant; but in such a case, in order to charge the master, the immediately predominating purpose of the servant must have had some relation to his master's service beyond a mere intent to resume it later. *Stegman* v. *Company*, 243 Mass. 269, 273. The point at which a servant who has thus departed from his master's service may be held to have reëntered it has been the subject of much difference of opinion. If the question were an open one in this jurisdiction (*Danforth* v. *Fisher, supra; Roulias* v. *Crafts, supra; Groatz* v. *Day, supra*), it is not here involved since Shea had not yet reached the goal of his departure. Even in jurisdictions where the more liberal rule prevails in this regard, it is held that there can be no resumption of the relation that has been suspended while the servant is still primarily bent on the accomplishment of his personal undertaking. At the time of the accident he must be performing some act in the furtherance of his master's business. See *Kohlman* v. *Hyland*, 54 N. D. 710, 717. "The field of duty once forsaken, is not to be reëntered by acts evincing a divided loyalty and thus continuing the offense." *Cardozo*, J., in *Fiocco* v. *Carver*, 234 N. Y. 219, 224; *Fletcher* v. *Meredith, supra*, 583. See Am. Law Inst. Restatement, Agency (Tent.), s. 463, b. Here Shea at the time of the accident was retarding rather than advancing his master's interest. The plaintiff's exception to the direction of a verdict for O'Gorman is overruled.

II. It is understood that the transfer of the exception to the *pro forma* ruling in the action of debt is intended primarily to raise the question whether, under the provisions of the policy, Shea was an additional "assured" and the unsatisfied judgment against him a direct obligation of the insurer. By its terms the defendant company agreed with the "Named Assured," O'Gorman, as respects public liability for the "disclosed automobile," as follows: "Section I . . . TO PAY all sums which the Assured shall become liable to pay as damages imposed upon him by law for bodily injury, including death at

any time resulting therefrom ... accidentally sustained by any person ... if caused by the ownership, maintenance or use of [such] ... automobile ... for the purposes ... stated" "Section II. ... (1) The unqualified word 'Assured' includes not only the Named Assured but any other person ... while legally using ... such automobile, including also any other person ... legally responsible for the use thereof, provided the disclosed and actual use of such automobile is ... with the permission of the Named Assured."

Both parties must have understood their contract conformed to the requirements of statutory law. *Boston Ice Co.* v. *Railroad*, 77 N. H. 6, 13. We are not, however, left to implication in this regard, for the policy contains the express stipulation that "The insurer agrees to accept and include in this policy the provisions of Chapter 54, Laws of the State of New Hampshire, 1927." Its insertion was in compliance with the terms of the cited statute which provided, as a prerequisite to a required approval of the policy by the insurance commissioner, that the policy must contain "an agreement that insurance is provided in accordance with and subject to the provisions of this act." Laws 1927, *c.* 54, *s.* 6. The contract therefore embodies the statute.

The persons required by the act to be covered in any motor vehicle liability policy, are, "The [named] insured and any person responsible for the operation of the insured's motor vehicle or trailer, with his express or implied consent." *Id., s.* 1, II. The more restrictive terms of the policy plainly disclose that the insurer did not intend to contract for protection beyond the call of the statute. In so far as they purport to limit the coverage enjoined by the act, they are supplanted by the words of the statute. It follows that the question whether Shea was an additional assured rests upon the intention of the legislature, and calls for an interpretation of the language of the act.

The contention of the plaintiff is that the "express or implied consent" of the owner intended by the statute is his consent to possess and operate the car, and that once the operator is in possession of the vehicle with the owner's consent he is an "insured" within the act, although making an unpermitted use of the car at the time the injury was inflicted; while the position of the defendant company is that the consent which the statute requires is to the use being made of the car at the time of the accident. It may be conceded that the equivocal language of the statute standing alone is capable of either construction. The intention of the legislature must therefore be sought from the other competent evidence.

In order to reach a correct understanding of this language in its relation to other portions of the statute, it will be necessary to consider its place and function in the legislative scheme. In 1925, an act had been proposed requiring assurance of financial responsibility as a prerequisite to the registration of motor vehicles. "The idea sought to be made law . . . [was] that the collectibility of a judgment shall be reasonably assured in every case." *Opinion of the Justices*, 81 N. H. 566, 570. The bill failed of passage. The act of 1927 (Laws 1927, *c.* 54), instead of compelling financial responsibility in the operators of motor vehicles by requiring liability insurance as a prerequisite to the registration of any motor vehicle, as contemplated by the earlier proposed act, sought by indirection to induce all owners of cars to carry insurance. *Ss.* 2 and 3 of the act subjected each motor vehicle owner to a suspension of his license, and of all registrations of cars carried in his name, upon certificate of the superior court that there has been a failure to comply with its order to furnish security. Such order may be made upon a petition for security by the injured plaintiff in any action at law for damages caused by the negligent operation of the licensee's car, it being found that the accident was due to the defendant's negligence, and that the car was being operated by the owner or with his consent. Reinstatement of the owner's license and registrations, was conditioned upon his furnishing security for the injury inflicted, in one of the forms provided by the statute of which the more comprehensive one was a "motor vehicle liability policy." *s.* 6. It is in the statutory definition of such policy (*s.* 1, II) that the language limiting the insureds, hereinbefore quoted, appears; to repeat and emphasize, the insured shall include "*any person responsible for the operation of the* [named] *insured's motor vehicle . . . with his express or implied consent.*"

This language must be considered in the light of the major provisions of the act, namely, *ss.* 2 and 3. The language of *s.* 2, limiting the finding on which the suspensions were to be based if the car was being operated by a person other than the owner, was, "whether . . . the motor vehicle . . . *was being operated with the express or implied consent of the owner.*" The italics are ours. This language is three times repeated in these two sections. In each case the stipulated consent was to the car "*being operated.*" The language makes no reference to, and carries no thought of, consent to the initial possession of the vehicle. It would naturally be expected that a statutory statement of the terms of a policy, especially provided to relieve the owner from a suspension of his license, would be coëxtensive with that de-

fining the circumstances which afford a basis for such suspension. In other words, as the owner was to lose his license only if the car at the time of the accident was "being operated" with his consent, it is unlikely that the legislature intended to require the owner, in order to relieve himself from such consequence, to carry a policy which should protect, not alone those operating with his consent, but all persons whose initial possession of the car may have been with his permission. Therefore, construing the language in s. 1, II in the light of its purpose and place in the legislative scheme, the words "express or implied consent" must be deemed to refer to the operation of the car at the time the liability, if any, arose.

The words "responsible for" are not necessarily inconsistent with this view. They perform a legitimate office in defining the legal relation of an injured plaintiff to the possible party defendant. The statutory "insured[s]" embrace any person operating the car with the owner's consent. They include a bailee of the owner whether he is operating the car in person or by his servant, agent or appointee, so long as the use being made of the car is within the bounds of the owner's permission. If the car, at the time of the accident, is being driven by a subordinate of the bailee the words "responsible for" are essential to cover the bailee. They are likewise requisite to include the garage man whose mechanic may be testing the owner's car on the road. The function of the words is to extend the protection of the policy not only to the operator of the car but to any person responsible for its operation. The expression describes the legal relation of such a party to the plaintiff. It was not designed to be descriptive of the factual relation of the operator to the owner. The latter feature is covered by the language as to consent.

Another ground for the conclusion reached is the reluctance of the court to impute a legislative purpose to impose vicarious liability unless such an intention is clearly expressed. The attitude of this court toward any extension of such liability is found in its refusal to adopt the "dangerous implement doctrine," or "family car doctrine" existing in other jurisdictions (*Brown* v. *Collins*, 53 N. H. 442; *Danforth* v. *Fisher*, 75 N. H. 111, 112; *Caswell* v. *Garage*, 84 N. H. 241, 256; *Moulton* v. *Langley*, 81 N. H. 138, 142; *LaFond* v. *Richardson*, 84 N. H. 288), or to follow the questionable precedents of other courts in the expansion of the vicarious liability of the master. *Cain* v. *Wickens*, 81 N. H. 99, 100; *Groatz* v. *Day*, 81 N. H. 417, 418. See section I of this opinion. Here the owner, himself without fault, is required to pay the premium called for to protect a third party for another's

wrong. The liability is none the less vicarious in character because, instead of being made liable to a judgment for damages, the owner is subject to the payment of a premium as the price of his freedom from the drastic provisions of the act. If the intent had been what the plaintiff claims, it would have been easy for the legislature to have qualified the term "consent" by the words "whether the particular use was authorized or not," or by other appropriate expression. Such an intention is not to be inferred from the equivocal language used, particularly since all of the terms employed may be given a fair meaning without offending the policy of the law so well established in this jurisdiction.

Finally, and of especial force, are the consequences of the construction contended for by the plaintiff. It would submit the insurer to liability without any express statutory limitation. If the consent to the initial possession of the car spells liability regardless of the extent of the driver's departure from the permitted use, then the insurer here would have been liable for any injury inflicted by Shea's negligent operation of the car; as for instance, if, at the time of its occurrence, instead of making a detour of a half mile, he had, without the owner's consent, been embarked on a trip to Boston or to California. The suggestion in argument that a reasonable departure from the permitted use was the intended limit finds no authorization in the statute and would be extremely difficult of application. The reasonableness of one of two possible constructions is a matter competent for consideration. *Clough* v. *Railroad*, 77 N. H. 222, 230; *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 4; *State* v. *Company, ante* 16.

Kindred questions have been considered in other jurisdictions with varying results. *Dickinson* v. *Casualty Co.*, 101 Conn. 369; *Stovall* v. *Indemnity Co.*, 157 Tenn. 301; *Peterson* v. *Maloney*, 181 Minn. 437; *Maryland Casualty Co.* v. *Hoge*, 153 Va. 209; *Maryland Casualty Co.* v. *Ronan*, 37 Fed. Rep. (2d) 449; *Odden* v. *Indemnity Co.*, 156 Wash. 10; *Johnson* v. *Company*, 131 Me. 288; *Heavilin* v. *Wendell*, 214 Ia. 844; 72 A. L. R. 1375, *note*. In some of the cases which appear to support the plaintiff's contention the facts would support findings of permissive use at the time of the accident. Others deal with the construction of policies unaffected by the statute, and rest primarily upon the rule that all doubts in the construction of insurance contracts are to be resolved in favor of the insured. This rule is not in force here. *Metropolitan Life Insurance Co.* v. *Olsen*, 81 N. H. 143, 145; *Stevens* v. *Insurance Co.*, 84 N. H. 275, 278; *Cartier* v. *Casualty Co.*, 84 N. H. 526, 527. In the present case we regard the language of our

statute as decisive of the issues. It is therefore unnecessary to give such authorities further consideration.

III. The policy binds the insurer to defend any suit brought against the assured to recover damages on account of any injury covered by its terms, to pay any judgment against him obtained therein regardless of his bankruptcy, and in the latter event authorizes direct proceedings by the judgment creditor. It reserves to the insurer the right to settle "any claim or suit" against the assured, requires the latter's coöperation and denies to him the right to make any payment, assume any obligation or incur any expense other than immediate surgical relief except at his own cost. The plaintiff claims that the defendant company is estopped to deny its liability upon the verdict against Shea because of its continued appearance and defence after a verdict had been directed for O'Gorman.

It has been suggested that the policy furnishes no basis for an estoppel because Shea was not a party to the contract. Shea was insured if his use was permissive. By the terms of the policy an additional assured stood precisely like a named assured, as far as the rights and duties of the insurer were concerned. The policy was procured by the named assured for the benefit of the additional assured. While it is true that the latter could accept or reject the provisions for his benefit, as far as he was concerned; yet, when he did accept, the contract was as though made directly with him in the first instance.

The policy created certain rights for injured parties; and these rights are more extensive than those arising under an indemnity policy to which the statute here involved does not apply. Shea was powerless to modify these rights in any way.

The form of policy required by the statute, and issued in this instance, is in part at least security to the party injured by the negligence of parties specified in the policy. It goes beyond the ordinary policy of indemnity issued to protect a possible defendant. A payment to Shea would not discharge the obligation. Laws 1927, c. 54, s. 6.

The security ordered under s. 3, when there is no insurance, runs directly to the injured party. And a certificate under s. 4, that a policy has been issued, is made a proper substitute for such security. Other provisions of ss. 6, 10, also show that the insurer is liable directly to the plaintiff. The statute thus plainly indicating the legislative purpose, the plaintiff may resort directly to this security, without the aid of any equitable doctrines. Such is the meaning of a policy issued under the act.

It does not affect the plaintiff's rights that the consideration did not move from him. It was entirely within the power of the legislature to provide that one may rely upon a contract for which he did not furnish the consideration. An obligation upon the part of the insurer to the injured party was created by the policy. It is true that the latter may decline to take advantage of the right conferred upon him. But until he manifests such intention, his statutory rights cannot be impaired by any act of the insurer. And as he may lose his right by certain conduct in relation thereto, so on the other hand the insurer may lose its right to contest the applicability of the contract to his case.

In the present instance the insurer appeared for Shea and conducted the trial as though it had the right so to do. As to Shea, this would ordinarily foreclose any question of the applicability of the policy to him. This is on the theory that as to him such conduct, plus the policy obligations, implies an undertaking to discharge his liability to the extent of the policy. There is no sound reason why it should not work a similar result as to the plaintiff's rights. Having intervened and defended against his claim of negligence, as matter of right under the policy, it is ordinarily too late to deny the applicability of the policy after a trial of the merits.

The insurer's defence of the suit against Shea, without reservation, with a full knowledge of the facts, and without excusing circumstances would imply its binding acknowledgment that it had insured him and hence that the use was permissive. *Sanders* v. *Insurance Co.*, 72 N. H. 485, 492, 498, 501, 502; *Lombard* v. *Company*, 78 N. H. 110, 111. When an insurer desires to raise the question whether the liability charged is one covered by the policy, it should be done seasonably, and, in any event, before the plaintiff has been prejudiced by the delay. *Doolan* v. *Company*, 85 N. H. 531; *Mason-Henry Press* v. *Insurance Co.*, 211 N. Y. 489; *Meyers* v. *Casualty Co.*, 12 Fed. Rep. (2d) 52, 55. Ordinarily, and in the absence of agreement of the parties, the issue is one calling for preliminary presentation, so that the insurer's right or duty to defend the action for negligence may be first determined. But in this case the circumstances were unusual. The insurer's duty to defend O'Gorman was unquestioned, the actions against him and Shea were tried together and the issues for trial in the actions were identical except for the additional issue of Shea's scope of employment presented in the action against O'Gorman. The insurer had as much duty to defend one action as the other, subject to its exemption from defending the action against Shea if his use proved to be unpermitted.

If under all the circumstances the insurer was chargeable with undue delay in presenting the issue of non-liability for Shea's negligence, the plaintiff should have judgment. This issue is one of fact, and it has not been tried. The *pro forma* character of the ruling holding the insurer liable shows that no consideration has been given to it. The ruling cannot be sustained upon this ground, since the findings necessary to support it have not been made.

IV. If, however, the company prevails upon this issue there is a further question to be considered. The issue of permission given Shea by O'Gorman to make incidental personal use of the car when on O'Gorman's business has not been tried. It was not material in the trial of the issues of liability of either Shea or O'Gorman. It became material only upon the issue of the chargeability of the trustee. If this issue is found in the affirmative, Shea was an additional assured and the trustee is chargeable. The *pro forma* ruling that the trustee was chargeable relieved the plaintiff from the need to go further. If under the circumstances justice requires that the plaintiff have opportunity to adduce proof of permissive use, leave so to do should be granted, and the issue tried.

The *pro forma* ruling in the action of debt is set aside.

The orders must be

*In the action at law, exception overruled.*

*In the action of debt, exception sustained.*

All concurred.